

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 21, 2023**

*Mark X. Mullin*

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 22-40487-MXM-11 |
| | § | |
| FORE MACHINE, LLC, *ET AL.*,[1] | § | CHAPTER 11 |
| | § | |
| DEBTORS. | § | JOINTLY ADMINISTERED |
| | § | |

**MEMORANDUM OPINION
REGARDING GL EDEN, LLC'S APPLICATION
TO APPROVE AND PAY ADMINISTRATIVE EXPENSE CLAIM**
*[Relates to ECF No. 772]*

Before the Court is the Application[2] filed by GL Eden, LLC (the "***Landlord***") requesting

the allowance and payment of an administrative expense claim in the estimated aggregate amount

of $1,767,459.03.  NewSpring Mezzanine Capital III, L.P., and Southfield Mezzanine Capital, L.P.

---

[1] Fore Machine, LLC, ("***Fore Machine***"); Fore Aero Holdings, LLC, ("***Holdings***"); and Fore Capital Holding, LLC, ("***Capital***") (together, the "***Liquidating Debtors***" of this "***Case***"); and the Liquidating Debtors and Aero Components, LLC ("***Aero***") (together, the "***Debtors***").

[2] *Application to Approve Payment of Administrative Expense Claim*, [ECF No. 531], *First Amended Application to Approve Payment of Administrative Expense Claim*, [ECF No. 666], and *Second Amended Application to Approve Payment of Administrative Expense Claim*, [ECF No. 772] (together, the "***Application***").

(together, the "**Secured Lenders**") filed an Objection[3] to the Application contending that the Application lacks merit and should be denied in full.

The Court has considered the Application, Objection, Landlord's Reply,[4] Stipulation,[5] testimony of witnesses, exhibits admitted into evidence, arguments of counsel, and Post-Trial Briefs.[6]  For the reasons detailed below, the Court the finds and concludes that the Landlord is entitled to the allowance and payment of an administrative expense claim in the total allowed amount of $441,513.00.

## I.     JURISDICTION AND VENUE

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), and (O).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).  The Court has statutory and constitutional authority to enter a final order in this matter.

## II.     SUMMARY OF DISPUTE

Although the Landlord raised additional claims in its Application, the principal dispute before the Court is which party should ultimately bear the financial burden to remove and properly dispose of large Vats of Chemical Waste[7] left on the lease Premises after the Liquidating Debtors

---

[3] *Objection to Application to Approve Payment of Administrative Expense Claim*, [ECF No. 603], *Sur-Reply to Response to Objection to Application to Approve Payment of Administrative Expense Claim*, [ECF No. 686], and *Second Sur-Reply to Response to Objection to Application to Approve Payment of Administrative Claim*, [ECF No. 777] (together, the "**Objection**").

[4] *Response to Objection to Application to Approve Payment of Administrative Expense Claim*, [ECF No. 665] (the "**Landlord's Reply**").

[5] *Stipulation Regarding Certain Facts*, [ECF No. 811] (the "**Stipulation**").

[6] *Post-Trial Brief in Support of Objection to Second Amended Application of GL Eden to Approve Payment of Administrative Expense Claim*, [ECF No. 819] (the "**Secured Lenders Post-Trial Brief**"), *GL Eden, LLC's Post Trial Reply Brief in Support of Second Amended Application to Approve payment of Administrative Expense Claim*, [ECF No. 820] (the "**Landlord Post-Trial Brief**"), and *Response to Post Trial Reply Brief of G Eden in Support of Second Amended Application to Approve Payment of Administrative Expense Claim*, [ECF No. 826] (together, the "**Post-Trial Briefs**").

[7] As defined *Infra* at Section III.E. of this Memorandum Opinion.

vacated the Premises and rejected the Lease—the Liquidating Debtors (and by extension the Secured Lenders) or the Landlord.

On the Petition Date, the Liquidating Debtors filed their initial proposed plan of liquidation. The proposed plan of liquidation provided that the Liquidating Debtors intended to file a sale motion that would enable the Liquidating Debtors to sell substantially all their assets through on-site auctions to be conducted on the Landlord's Premises.  Throughout the Case, however, the Landlord repeatedly raised concerns that if the Liquidating Debtors were authorized to use the Premises to liquidate substantially all their assets (primarily for the benefit of the Secured Lenders), then the Liquidating Debtors should also be required to remove all their property from the Premises after the conclusion of the on-site auctions and prior to vacating the Premises.

In response to the Landlord's repeated concerns, the Liquidating Debtors consistently represented—in both pleadings and representations in open Court—that after the conclusion of the on-site auctions and prior to vacating the Premises, they did indeed *intend* to remove any remaining property from the Premises as required by the Lease.  After the conclusion of the on-site auctions, however, the Liquidating Debtors failed to remove and properly dispose of the Vats of Chemical Waste prior to vacating the Premises and rejecting the Lease.

Consequently, the Landlord filed the Application seeking, among other claims, reimbursement for the cost to remove and properly dispose of the Vats of Chemical Waste that the Liquidating Debtors failed to remove and properly dispose of prior to vacating the Premises and rejecting the Lease.  The Secured Lenders filed their Objection to the Application contending that any such costs incurred by the Landlord to remove and properly dispose of the Vats of Chemical Waste constitutes a pre-petition unsecured damages claim as opposed to an administrative expense

claim.  The Court will address each of the factual and legal disputes raised by the Landlord and

the Secured Lenders in support of their respective positions.

### III.    BACKGROUND FACTS

The Liquidating Debtors specialized in the fixed wing and rotary wing aerospace market.

Their manufacturing operations used large industrial machinery and equipment and their

manufacturing process generated various chemical and hazardous waste.

### A.    The Lease

On June 1, 2020, Eden Fort Worth Industrial, LLC (the "***Initial Landlord***")[8] and Holdings

entered into the Lease[9] of the Premises.[10]  The Lease Premises included eight buildings located on

eight different street addresses in Fort Worth, Texas.  Fore  Machine, an affiliate of Holdings,

conducted  its  manufacturing  operations on the Premises from sometime prior to June 1, 2020,

until  November  21,  2021—when  Fore  Machine  ceased  its  manufacturing  operations  and

terminated substantially all its employees.

### B.    Debtors File Bankruptcy and Pursue Liquidating Plan and Sale of Assets

On  March  7,  2022  (the  "***Petition  Date***"),  each  of  the  Debtors  filed  their  respective

petitions for relief under Chapter 11 of the United States Bankruptcy Code.

#### 1.    *The Liquidating Debtors' Liquidating Plan and Confirmation Hearing*

---

[8] On March 24, 2022, the Landlord and Initial Landlord entered into real estate purchase agreement whereby the Landlord agreed to purchase the Premises from the Initial Landlord.  *See* Secured Lenders Ex. A.  The purchase agreement closed on June 24, 2022.  Consequently, the Landlord became the Initial Landlord's successor-in-interest in the Lease.

[9] *See* Secured Lenders Ex. UU; *see also* Landlord Ex. 9 Bates Numbers 573 through 610—*Lease Between Eden Fort Worth Industrial, LC, a Delaware Limited Liability Company, as Landlord, and Fore Aero Holdings, LLC, a Texas Limited Liability Company, as Tenant dated June 1, 2020* (the "***Lease***").

[10] The term ("***Premises***") is defined in the Lease.  *See* Secured Lenders Ex. UU.

4

Debtors Fore Machine, Holdings, and Capital (the "***Liquidating Debtors***") jointly filed their Initial Liquidating Plan.[11]   The Initial Liquidating Plan was subsequently amended and supplemented by the First Amended Liquidating Plan,[12] Plan Supplement,[13] and Second Amended Liquidating Plan[14] (together, the "***Liquidating Plan***").   The "lynchpin" of the Liquidating Plan provided that the Liquidating Debtors would file a sale motion seeking authority to sell substantially all their assets, including the large industrial machinery and equipment previously used in the Liquidating Debtors' manufacturing process, through onsite auctions to be conducted on the Landlord's Premises.

The Landlord filed a Plan Objection[15] raising, in relevant part, the Landlord's concerns that (i) the Liquidating Debtors would fail to remove all their property—including but not limited to the large industrial machinery and equipment—from the Premises when they ultimately vacated the Premises, and (ii) Debtors' Liquidating Plan failed to provide the Landlord with post-Effective Date remedies should the Liquidating Debtors fail to remove all their property from the Premises.[16]

On May 10, 2022, the Court commenced the confirmation hearing on the Liquidating Plan. During the hearing, the Landlord reiterated its concern that the Liquidating Debtors would fail to remove all their property from the Premises prior to vacating the Premises and rejecting the

---

[11] *Joint Chapter 11 Plan of Liquidation for Debtors Fore Aero Holdings, LLC, Fore Machine, LLC and Fore Capital Holdings, LLC*, ECF No. 16 (the "***Initial Liquidating Plan***").   Also on the Petition Date, Aero filed its *Aero Components, LLC's Chapter 11 Plan of Reorganization*, ECF No. 14 (the "***Aero Reorganization Plan***").   Aero and the Aero Reorganization Plan are not relevant to this dispute.

[12] *Joint Chapter 11 Plan of Liquidation for Debtors Fore Aero Holdings, LLC, Fore Machine, LLC and Fore Capital Holdings, LLC*, ECF No. 160 (the "***First Amended Liquidating Plan***").

[13] *Plan Supplement for Joint Chapter 11 Plan of Liquidation for Debtors Fore Aero Holdings, LLC, Fore Machine, LLC and Fore Capital Holdings, LLC*, ECF No. 268 (the "***Plan Supplement***").

[14] *First (sic) Amended Joint Chapter 11 Plan of Liquidation for Debtors Fore Aero Holdings, LLC, Fore Machine, LLC and Fore Capital Holdings, LLC*, ECF No. 330 (the "***Second Amended Liquidating Plan***").

[15] *Eden Fort Worth Industrial, LLC's Objection to Debtors' Fore Aero Holdings, LLC, Fore Machine, LLC, and Fore Capital Holding, LLC's Joint Plan of Liquidation*, ECF No. 296 (the "***Plan Objection***").

[16] Plan Objection at pg. 3, ¶ 8.

Lease.[17]   The Liquidating Debtors and the Landlord resolved the Plan Objection with specific
language that was inserted into the confirmation order.   The Court continued the confirmation
hearing to May 13, 2022, to enable all parties to continue negotiations concerning the form of the
confirmation order and, if necessary, to resolve pending disputes over the form of the confirmation
order.

On May 13, 2022, the Court reconvened the confirmation hearing to address disputes raised
by several parties—including the Liquidating Debtors, Landlord, and Secured Lenders—over the
form of confirmation order.   When addressing the resolution of the Landlord's Plan Objection and
dispute over the form of the confirmation order, the Liquidating Debtors' counsel represented:

- "As I mentioned, it's extremely important for the debtors to complete the sale by July 31st ***and that the premises be left completely clean pursuant to the lease***."[18]

- ***"[I]f we leave things behind*** or if there's damage to the facility, ***that would be the responsibility of the debtors under the lease*** and would likely constitute an administrative expense claim that would need to be paid in full."[19]

- "I've had those conversations with [Secured Lenders' counsel] who also understands that the debtors will have use of cash collateral throughout the end of the term of the liquidation. Also, in the revised auction sale agreement . . . there will be a deposit . . . of $500,000."[20]

- "So the liquidating debtor should have more than adequate cash to pay rent through July 31st. ***And God forbid, if anything is left behind***, or if there's anything wrong with the facility, ***to pay administrative claims in connection therewith***."[21]

---

[17] ECF No. 478, at pg. 33, line 25 through pg. 35, line 4; pg. 190, line 13 through pg. 191, line 16.

[18] ECF No. 786, at pg. 15, lines 18–21 (emphasis added).

[19] ECF No. 786, at pg. 16, lines 4–8 (emphasis added).

[20] ECF No. 786, at pg. 16, lines 11–16.

[21] ECF No. 786, at pg. 16, lines 17–21 (emphasis added).

The Secured Lenders' counsel noted on the record, however, that the Secured Lenders did not agree with the Liquidating Debtors' position that the Landlord may be entitled to an administrative expense claim "if the debtor were not to surrender the [Premises] with all the debtor's property out of it."[22]

On May 16, 2022, the Court entered the Confirmation Order[23] confirming the Liquidating Plan. The Confirmation Order provides, in relevant part, for a reserve of $500,000.00 (the "***$500,000 Reserve***") to be held by the Plan Administrator[24] to pay an allowed administrative expense claim of the Landlord. The Confirmation Order provides further that (i) the Landlord would have until thirty days after the Effective Date[25] of the Liquidating Plan to file an application for an administrative expense claim, and (ii) the Liquidating Debtors and Secured Lenders reserved all rights to object to any such claim filed by the Landlord.

### 2.   *The Debtors' Sale Motion and Hearing*

On May 8, 2022, the Liquidating Debtors filed the Sale Motion[26] as contemplated in the Liquidating Plan. The Sale Motion provided, in relevant part:

- "Additionally, the Liquidating Debtors believe that they will save significant amounts of cash based on their ability to vacate and reject the real property lease for the [Premises], without having to incur the costs of removing the Assets and continuing to incur property and insurance charges."[27]

---

[22] ECF No. 786, at pg. 17, lines 13–20.

[23] *Findings of Fact, Conclusions of Law, and Order (I) Approving Liquidating Debtors' Joint Disclosure Statement on a Final Basis and (ii) Confirming Liquidating Debtors' Joint Chapter 11 Plan of Liquidation*, ECF Nos. 398 and 400 (the "***Confirmation Order***").

[24] As defined in the Confirmation Order, ECF Nos. 398 and 400.

[25] The Effective Date was anticipated to occur on or before July 31, 2022, but did not occur until October 4, 2022. *See* ECF No. 599, at pg. 2.

[26] *Debtors' Motion for an Order Pursuant to 11 U.S.C. Sections 105(a) and 363(b) and (f) of the Bankruptcy Code (A) Authorizing, but not requiring, the Liquidating Debtors to Sell at Auction Certain Assets Free and Clear of all Liens, Claims, Interests, and Encumbrances, (B) Approving Auction Procedures Relating to such Auction Sales, and (C) Granting Related Relief*, ECF No. 335 (the "***Sale Motion***"), at pg. 5, ¶ 11.

[27] Sale Motion at pgs. 5–6, ¶ 13 (emphasis added).

- "19. Further, the Liquidating Debtors cannot easily vacate and reject the underlying real property lease (the "Lease") with Eden Fort Worth Industrial, LLC (the "Landlord") for the [Premises] *until the Assets are sold and removed*. The Liquidating Debtors' ability to reject the Lease as and when they determine is appropriate will result in significant cost savings for the Liquidating Debtors and their estates because, as of the Lease rejection date, the Liquidating Debtors will no longer be obligated to pay rent as an administrative expense for [Premises], which is no longer operational or generating any revenue. *Selling the Assets through onsite auctions will also save the Liquidating Debtors the cost of removing the Assets from the [Premises], a requirement for vacating the premises under the Lease*. In Sum, the Liquidating Debtors estimate the cost savings associated with their ability to vacate the [Premises] and reject the Lease without having to remove the Assets from the [Premises] to be significant."[28]

On May 12, 2022, at 9:14 p.m. (the night before the hearing on the Sale Motion), the Liquidating Debtors filed an Amended Sale Motion[29] purportedly to only reflect the modified terms of the Auction Services Agreement between the Liquidating Debtors and Perfection Global LLC ("*Perfection*"), the agent proposed by the Liquidating Debtors to conduct the on-site auction. The Liquidating Debtors also filed a Notice of Amended Sale Motion[30] to highlight and discuss the "improved terms" with Perfection reflected in the amended Auction Services Agreement attached to the Amended Sale Motion.

But, for reasons that are not clear in the record or to the Court, the Liquidating Debtors deleted from the Amended Sale Motion the above (i) representation that was in Paragraph 13 of the Sale Motion, and (ii) entire Paragraph 19 that was in the Sale Motion. Neither the Amended Sale Motion nor the Notice of Amended Sale Motion highlight or explain why the Liquidating

---

[28] Sale Motion at pg. 8, ¶ 19 (emphasis added).

[29] *Debtors' Amended Motion for an Order Pursuant to 11 U.S.C. Sections 105(a) and 363(b) and (f) of the Bankruptcy Code (A) Authorizing, but not requiring, the Liquidating Debtors to Sell at Auction Certain Assets Free and Clear of all Liens, Claims, Interests, and Encumbrances, (B) Approving Auction Procedures Relating to such Auction Sales, and (C) Granting Related Relief*, ECF No. 335 (the "*Amended Sale Motion*").

[30] *Notice of Filing of Amended Auction Services Agreement with Guarantee and Stevenson Declaration*, ECF No. 389 (the "*Notice of Amended Sale Motion*").

Debtors removed the above representations in the Amended Sale Motion.  Further, neither counsel for the Liquidating Debtors nor counsel for the Secured Lenders referenced or highlighted the deletion during the hearing.[31]

The Landlord filed an Objection to Sale Motion[32] again arguing, in relevant part, that: (i) the Liquidating Debtors be required to remove all of their property from the Premises, as was intended by the negotiated resolution of the Landlord's Plan Objection,[33] (ii) "any personal property remaining on the leased Premises following the sale will be removed at the [Liquidating] Debtors' or auctioneer's expense, regardless of any abandonment or sale by the [Liquidating] Debtors,"[34] and (iii) "[u]nder the Lease, [Liquidating] Debtors are responsible and solely liable for any 'Hazardous wastes' (as defined therein)" and that the Liquidating Debtors must "ensure that [Liquidating] Debtors' obligations in this regard continue until all such substances are safely and properly removed."[35]  The Court overruled the Landlords' objections as not being relevant to the relief sought in the Sale Motion and because the Landlord's objections were addressed, in part, in the Confirmation Order—which preserved the Landlord's ability to file an administrative expense claim, if necessary, and the creation of the $500,000 Reserve that would be available to pay any such allowed administrative expense claim.[36]

---

[31] The Court first discovered the deletion when drafting this Memorandum Opinion.

[32] *Eden Fort Worth Industrial, LLC's Objection to Debtors' Motion for an Order Pursuant to 11 U.S.C. Sections 105(a) and 363(b) and (f) of the Bankruptcy Code (A) Authorizing, but not requiring, the Liquidating Debtors to Sell at Auction Certain Assets Free and Clear of all Liens, Claims, Interests, and Encumbrances, (B) Approving Auction Procedures Relating to such Auction Sales, and (D)(sic) Granting Related Relief*, ECF No. 387 (the "***Objection to Sale Motion***").  The Objection to Sale Motion did not reference the Debtors' Amended Sale Motion as the two pleadings were filed at approximately the same time.

[33] ECF No. 387, at pg. 4, ¶ 9.

[34] ECF No. 387, at pg. 4, ¶ 11.

[35] ECF No. 387, at pg. 5, ¶ 12.

[36] ECF No. 786, at pg. 133, line 24 through pg. 134, line 5; *see also* Secured Lenders Ex. AA.

The Sale Order was entered on May 16, 2022.[37]  Thereafter, the on-site auctions were

conducted from June 21–24, 2022.[38]

## C.    Abandonment Motion and Hearing

On June 27, 2022, after the conclusion of the on-site auctions, the Liquidating Debtors filed

the Abandonment Motion[39] seeking authority to abandon all "Remaining Property."[40]   The

Liquidating Debtors defined "Remaining Property" in the Abandonment Motion as follows:

> "16.  After the Auction, the Liquidating Debtors are now left with various
> pieces of property, including (a) certifications and paperwork related
> to chain of custody in connection with any and all inventory or parts
> sold and/or made by the Liquidating Debtors at any time; (b) human
> resources and other employment related documents, which may
> include confidential information; (c) accounting documents
> (including financial reports, income and other tax returns, tax records,
> and other related documents); (d) the Liquidating Debtors' books and
> records; (e) bank documents (including bank statements and copies of
> cancelled checks); (f) inventory files; (g) promotional materials; (h)
> vendor and customer transactions and related agreements and
> information; (i) contracts, leases, insurance policies, and other
> contractual agreements of the Liquidating Debtors; (j) corporate
> governance documents, including minutes and board resolutions, and
> related information; (k) litigation files; (l) emails; (m) information
> related to these chapter 11 cases; (n) any other electronic or paper
> records maintained by the Debtors ((a) through (n), collectively, the
> "Documents"); (o) miscellaneous office furniture and equipment, (p)
> work in progress inventory; (q) inventory for various customers who
> have indicated they do not want to purchase it; (r) raw materials; (s)
> pallets; (t) all other remaining goods, inventory, equipment and
> material remaining ((o) through (t), collectively, the "Obsolete
> Materials," and together with the Documents, the "Remaining
> Property")."[41]

---

[37] *Order Pursuant to 11 U.S.C. Sections 105(a) and 363(b) and (f) of the Bankruptcy Code (A) Authorizing, but not requiring, the Debtors to Sell at Auction Certain Assets Free and Clear of all Liens, Claims, Interests, and Encumbrances, (B) Approving Auction Procedures Relating to such Auction Sales, and (C) Granting Related Relief*, ECF No. 395 (the "**Sale Order**").

[38] ECF No. 518, at pg. 4, ¶ 12.

[39] *Liquidating Debtors' Motion for Entry of an Order Authorizing (I) Abandonment of Certain Property and (II) Granting Related Relief*, ECF No. 468 (the "**Abandonment Motion**").

[40] ECF No. 468.

[41] ECF No. 468, at pgs. 5–6, ¶ 16.

Nowhere in the Abandonment Motion was there a reference to any liquids, chemicals, or hazardous waste on the Premises.

On June 28, 2022, the Landlord filed the Objection to Abandonment Motion[42] stating that the Landlord did not oppose the Abandonment Motion so long as all the Liquidating Debtors' property was removed from the Premises by the Liquidating Debtors.

During the hearing on the Abandonment Motion, the Liquidating Debtors' counsel again reiterated:

- "The hope, again, under the abandonment motion, Your Honor, is that *we would leave the facility effectively empty and in the condition we found it when we first leased it, which is the requirement under the lease*."[43]

- "So, you know, our goal is to empty the facility. The liquidating debtors' goal is to *empty the facility and fulfill its obligations under the lease* in the most efficacious manner . . . and make sure that we're out by July 31st."[44]

The Secured Lenders' counsel again noted on the record that the Secured Lenders did not agree with the Liquidating Debtors' position that (i) the Liquidating Debtors were obligated under the Lease to remove all their property from the Premises, or (ii) that the Landlord would be entitled to an administrative expense claim should the Liquidating Debtors fail to remove all their property from the Premises.[45]

The only evidence offered during the hearing in support of the Abandonment Motion was the declaration of Mr. Jens Verloop, the Chief Financial Officer of Fore Machine ("*Mr. Verloop*").[46] Mr. Verloop confirmed that the only property that was being abandoned was the "Remaining

---

[42] *Limited Objection to Motion for Abandonment*, ECF No. 484 (the "*Objection to Abandonment Motion*").

[43] ECF No. 510, pg. 120, lines 2–5 (emphasis added).

[44] ECF No. 510, pg. 122, lines 1–5 (emphasis added).

[45] ECF No. 510, pg. 125, line 16 through pg. 126, line 4.

[46] ECF No. 479.

Property," as defined and described in the Abandonment Motion.  Neither the Liquidating Debtors'

counsel nor Mr. Verloop mentioned, described, or testified that any liquids, chemicals, or

hazardous waste were intended to be included in the definition of "Remaining Property."

When responding to the Landlord's Limited Objection to Abandonment Motion, the

Secured Lenders' counsel specifically represented and admitted:

> "And there simply is no requirement that abandonment be conditioned so
> as to protect the interest of a non-debtor with *one exception, which is in the*
> *environmental sphere*.  And there, there are conditions that are placed on
> abandonment.  *But that is not an issue here.  There's no allegation that*
> *abandonment here would implicate any kind of environmental laws*."[47]

Based on the evidence in the record at that time, the Court granted the Abandonment

Motion and entered the Abandonment Order on July 6, 2022.[48]  The Abandonment Order is clear

and not ambiguous.  The only property subject to the Abandonment Order is the "Remaining

Property" as described in the Abandonment Motion.  The Abandonment Motion did not reference

any liquids, chemicals, or hazardous waste.  Additionally, the Liquidating Debtors did not include

any reference to liquids, chemicals, or hazardous waste in the definition of "Remaining Property."

Moreover, no evidence was offered during the hearing on the Abandonment Motion to

suggest that the Liquidating Debtors intended to include liquids, chemicals, or hazardous waste in

the property sought to be abandoned.  Likewise, the Liquidating Debtors' counsel made no

reference to any liquids, chemicals, or hazardous waste during the hearing on the Abandonment

Motion.  Finally, the Secured Lenders' counsel explicitly stated "[t]here's no allegation that

abandonment here would implicate any kind of environmental laws."[49]

---

[47] ECF No. 510, pg. 144, lines 2–8.

[48] *Order Authorizing (I) Abandonment or Disposal of Certain Property and (II) Granting Related Relief*, ECF No. 500
(the "*Abandonment Order*").

[49] *Supra* note 47 and accompanying text.

Furthermore, the liquids, chemicals and hazardous waste that were on the Premises constitute precisely the type of property that a debtor should disclose clearly in an abandonment motion and highlight during the hearing so all creditors, parties-in-interest, and the Court are crystal clear that such potentially hazardous property is intended to be included in property sought to be abandoned.  That was not done in this Case.  Consequently, the liquids, chemicals, and hazardous waste that were on the Premises remained property of the Liquidating Debtors' bankruptcy estates, notwithstanding the Abandonment Order.

Lastly, during the hearing on the Application, Mr. Verloop stated that he believed the Abandonment Order included the abandonment of "hazardous waste."[50]  But, Mr. Verloop also admitted during the hearing that there was no reference to liquids, chemicals, or hazardous waste in the Abandonment Motion or in his declaration in support of the Abandonment Motion.  The Court found Mr. Verloop's testimony on this issue to be unconvincing and contrary to his prior declaration and the prior representations made by the Liquidating Debtors' counsel during the hearing on the Abandonment Motion.[51]

---

[50] Testimony of Mr. Verloop, ECF No. 830, pg. 96, line 17 through pg. 97, line 9.

[51] The Court is disappointed at the lack of disclosure during the Case concerning the extent and volume of liquids, chemicals, and hazardous waste that were on the Premises.  The evidence presented by the Landlord during the hearing on the Application established that Mr. Verloop and the Liquidating Debtors had significant knowledge about the extent and volume of the hazardous material in the Vats of Chemical Waste, at the very latest, in April 2022 when Mr. Verloop received a notice from TCEQ.  *Infra* note 56 and accompanying text; *see also* Testimony of Mr. Verloop, ECF No. 830, pg. 15, lines 1–5 and lines 21–24.  Yet, no adequate disclosure concerning the extent or volume of the hazardous material on the Premises was made in pleadings or representations in open Court throughout this Case.  Although the Landlord's counsel tried to raise the issue concerning the Liquidating Debtors' lack of adequate disclosure about the Vats of Chemical Waste during a subsequent hearing on November 7, 2022 (the final fee application hearing for the Liquidating Debtors' counsel), the Court abruptly stopped the Landlord's counsel and chided him for raising, what the Court believed at that time, to be outrageous accusations. Now, having seen the evidence presented by the Landlord establishing the actual volume and hazardous nature of the Vats of Chemical Waste, the Court apologizes to the Landlord's counsel for having chided him—as it turns out, his accusations were not so outrageous.

13

### D.    Lease Rejection Motion and Hearing

On July 25, 2022, the Liquidating Debtors filed the Motion to Reject Lease[52] contending

that rejecting the Lease, effective July 31, 2022, was necessary, in part, because:

- "[m]ost of the Assets and other property have been removed from the Premises,"[53];

- "[t]he Liquidating Debtors property and casualty insurance expires on July 31, 2022;"[54] and

- "the Liquidating Debtors would risk incurring an additional month's rent in order to rent the empty Premises."[55]

The Motion to Reject Lease was set for hearing on an expedited basis on July 28, 2022.  At

the hearing, the Liquidating Debtors' counsel represented:

- "We note that most of the material at the facility has in fact been removed.  There is an exception which is ***certain chemical waste*** at the site.  Debtors had hoped to have this chemical waste removed this week.  However, we ***were told yesterday*** that the totes which are the containers that hold the chemical waste did not meet certain regulations."[56]

- "The company that the debtors are working with to dispose of these chemicals estimates that best case the removal of these chemicals will take two weeks and, at worst, will take four weeks. We understand an estimate of cost will be another approximately $35 to $45 thousand dollars."[57]

- "As your Honor may recall, there is a $500,000 reserve for administrative claims of the landlord under the confirmation order . . . .

---

[52] *Emergency Motion for Entry of an Order Under Section 365 of the Bankruptcy Code (I) Authorizing the Liquidating Debtors to Reject their Unexpired Commercial Real Property Lease; and (II) Granting Related Relief*, ECF No. 518 (the "***Motion to Reject Lease***").

[53] ECF No. 518, at pg. 4, ¶ 13.

[54] ECF No. 518, at pg. 4, ¶ 14.

[55] ECF No. 518, at pg. 6, ¶ 18.

[56] ECF No. 649, at pg. 8, lines 3–8 (emphasis added). Based on the evidence presented during the hearing on the Application, it is undeniable that the Liquidating Debtors had substantially more knowledge and information about the volume and hazardous nature of the Vats of Chemical Material than was disclosed during the hearing on the Motion to Reject Lease.  Additionally, the Liquidating Debtors had known that the containers did not meet certain TCEQ regulations as early as April 2022, as opposed to "yesterday" as represented during the hearing on the Motion to Reject.

[57] ECF No. 649, at pg. 8, lines 10–15.  Again, this representation woefully understated the time and cost required to remove and properly dispose of the Vats of Chemical Waste.

> From my conversation with the landlord's attorney, ***we understand that the landlord will agree to pay for the removal of the remaining chemicals and will assert claim against the estate for an administrative claim per the confirmation order***."[58]

The Secured Lenders' counsel, again, noted on the record that the Secured Lenders did not agree with the Liquidating Debtors' position and reserved the right to object to any administrative expense claim that the Landlord might file.[59]

Counsel for the Texas Attorney General—on behalf of the Texas Commission on Environmental Quality ("***TCEQ***")—was present at the hearing and represented:

> "It is TCEQ's priority that these chemicals properly be disposed of whether it be paid for by the debtor or paid for by the landlord.  They just need to be properly disposed of so that we don't have issues contaminating the environment or compromising health and human safety."[60]

In a subsequent hearing, Counsel for the Texas Attorney General again reiterated the TCEQ's position:

> "[T]hrough conversations had with the [Liquidating] Debtors and Landlord counsel, we knew that there would be a party responsible for handling this hazardous waste . . . TCEQ needs to make sure that there's somebody other than the State of Texas that will dispose of this hazardous waste properly.[61]

Based on the evidence in the record at that time, the Court granted the Motion to Reject Lease. The Lease was rejected effective July 31, 2022.[62]

## E.    Liquidating Debtors vacate Premises leaving the Vats of Chemical Waste

Notwithstanding the Liquidating Debtors' mantra throughout the Case that "the Premises be left completely clean," the Liquidating Debtors failed to remove from the Premises and properly

---

[58] ECF No. 649, at pg. 8, lines 16–23 (emphasis added).

[59] ECF No. 649, at pg. 9, lines 15–19.

[60] ECF No. 649, at pg. 10, lines 14–18.

[61] ECF No. 810, at pg. 13, lines 8–14.

[62] *Order Granting Emergency Motion for Entry of an Order Under Section 365 of the Bankruptcy Code (I) Authorizing the Liquidating Debtors to Reject their Unexpired Commercial Real Property Lease; and (II) Granting Related Relief*, ECF No. 524 (the "***Order Rejecting Lease***").

dispose of hundreds of containers, totes, and barrels of "certain chemical waste" (the "***Vats of Chemical Waste***").[63]

Following are two pictures[64] taken on August 3, 2022,[65] which reflect a representative example of some, but not all, of the Vats of Chemical Waste left on the Premises:



In addition to the Liquidating Debtors' prior representations and admissions that the Vats of Chemical Waste contain "chemical waste," the Landlord offered corroborating testimony during the hearing on the Application regarding the contents of the Vats of Chemical Waste from (i) Mr. James Brian Spence ("***Mr. Spence***"),[66] a licensed and certified Texas geoscientist; and (ii) designated deposition testimony of Mr. Jim Conner ("***Mr. Conner***"),[67] a Certified Electroplating Finisher during the hearing on the Application.

---

[63] ECF No. 649, at pg. 8, lines 3–8.

[64] Landlord Ex. 14.

[65] Testimony of Ms. Hale, 3:52:16 through 3:53:02.  Ms. Hale testified credibly that she took several pictures, including the two pictures above, of the Vats of Chemical Waste, left on the Premises by the Liquidating Debtors.

[66] ECF No. 829.

[67] ECF No. 807.

### *1.  Expert Testimony of Mr. Spence*

Mr. Spence provided expert testimony concerning the contents of the Vats of Chemical Waste.  Mr. Spence is an Associate Principal of EnSafe Incorporated, a full-service environmental, health, and safety management consulting firm.[68]  He has been with EnSafe for approximately 23 years.  Prior to working at EnSafe, Mr. Spence was employed by the Texas Water Commission n/k/a TCEQ.  While at the TCEQ, Mr. Spence worked and was trained in site inspections of companies that generated hazardous and industrial waste.  Mr. Spence also previously worked at LTV Aerospace and Defense where he was involved in its hazardous waste program.

The Court found Mr. Spence to be a credible witness with extensive knowledge, experience, and training in characterizing, managing, and disposing of hazardous and industrial waste.  Additionally, the Court found that Mr. Spence's scientific, technical, and specialized knowledge in the areas of identifying, characterizing, and disposing of hazardous and industrial waste was helpful in understanding the fact disputes concerning the contents of and disposal requirements for the Vats of Chemical Waste in this Case.  Finally, the Court found that Mr. Spence's testimony was based on sufficient and trustworthy facts and data and was the product of reliable principles and methods.

The Secured Lenders objected to the designation of Mr. Spence as an expert witness and the basis of his opinions.  The Court finds and concludes that the Secured Lenders' objections—to (i) the qualifications of Mr. Spence, and (ii) the validity and merits of his opinions—lack merit and are not persuasive.  Consequently, the Court overruled each of the Secured Lenders' objections and finds and concludes that Mr. Spence is qualified as an expert witness and was credible and persuasive.

---

[68] ECF No. 829, at pg. 4, line 12 through pg. 5, line 9, and pg. 6, line 22 through pg. 7, line 1.

To arrive at his opinions, Mr. Spence evaluated the processes taken to (i) inventory the Vats of Chemical Waste, (ii) characterize and profile the substances contained in the Vats of Chemical Waste, and (iii) develop the necessary steps and plans to remove and dispose of the Vats of Chemical Waste in compliance with Texas and Federal environmental laws.  Based on his evaluation and experience, Mr. Spence testified credibly that approximately 75% to 80% of the waste contained in the Vats of Chemical Waste constitutes "hazardous waste" as defined under applicable federal law; and the remaining waste is classified as "Class 1" waste under Texas law. Class 1 waste under Texas law may still be considered hazardous and in any event, requires specific steps and protocol for the proper disposal of such Class 1 waste under Texas law.  Mr. Spence testified further that even if a very small concentration of hazardous waste is included in a particular tote, then the entire tote is deemed a hazardous waste.[69]

Although the Secured Lenders dispute Mr. Spence's opinions that the Vats of Chemical Waste contain hazardous waste, the Secured Lenders failed to offer any credible evidence to controvert the credible testimony of Mr. Spence, or to controvert the Liquidating Debtors' admissions that the Vats of Chemical Waste contained "chemical waste."

### 2.    *Designated deposition testimony of Mr. Conner*

Mr. Conner did not testify live; rather, the Landlord and the Secured Lenders designated certain portions from his deposition taken on February 10, 2023.[70]  Mr. Conner is a Certified Electroplating Finisher (a CEF designation), and he previously carried a wastewater superintendent's license for the State of Maryland.  Mr. Conner has been an environmental consultant for the Debtors for about ten years, including being responsible for maintaining the

---

[69] ECF No. 829, at pg. 38, lines 2–6.
[70] ECF Nos. 807 and 813.

Debtors' environmental and aerospace accreditations.  Mr. Conner has testified in other cases as
an expert witness in metal finishing.

Mr. Conner's relevant designated deposition testimony primarily concerned the liquid
waste contained in the Vats of Chemical Waste.  Mr. Conner corroborated the testimony of Mr.
Spence with his opinion that much of the liquid waste contained in the Vats of Chemical Waste
constituted "hazardous waste" based on "EPA guidelines and the State of Texas guidelines."[71]  His
opinions were also based on his personal knowledge "from installing a lot of the equipment that
was used there . . ." and he was "responsible for consulting during the ongoing operation of that
process for a number of years."[72]

Mr. Conner also testified that the waste generated by the Liquidating Debtors, including
the waste contained in the Vats of Chemical Waste, is "required by the EPA not to store it greater
than 90 days."[73]  Mr. Spence also referred to a 90-day timeframe for storing hazardous waste.[74]
Mr. Connor testified further, without objection:

> Q. (by Ms. Lindauer) So there was waste out there that should have
> been removed within 90 days but wasn't because of the closing of
> the business, so there was waste that was out there for, as I'm
> understanding our testimony, for a period that exceeded that 90 days;
> is that right?
>
> A. (by Mr. Conner) That is correct, yes.
>
> . . .
>
> Q. In your experience with these companies, had they had waste that
> had sat out there for a period greater than 90 days previously?
>
> A. They probably did.

---

[71] Landlord Ex. 10, pg. 78, line 22 through pg. 79, line 4 (designated by ECF No. 807 and read into the record).

[72] Landlord Ex. 10, pg. 79, lines 17–21 (designated by ECF No. 807 and read into the record).

[73] Landlord Ex. 10, pg. 48, lines 17–21 (designated by ECF No. 807 and read into the record).

[74] *See* ECF No. 829, at pg. 7, lines 9–11.

. . .

Q.     And I think you told us that during the time that you were involved
       with this particular project which started in or about December of
       2021, best we can tell, that you didn't see anything ship out of that
       facility for all the time that you were involved there; is that right?

A.     That's correct.  They were in the process of profiling and getting
       quotes and getting a schedule to remove it.[75]

The Court found that Mr. Conner's designated deposition testimony corroborated the

credible expert testimony of Mr. Spence.

Mr. Conner further testified (in his designated deposition testimony) that, per State and

Federal laws, the waste contained in the Vats of Chemical Waste should have been properly

disposed of by the Liquidating Debtors in compliance with the ninety-day period guideline.

Although Mr. Conner admitted that some of the waste contained in the Vats of Chemical Waste

had been on the Premises for more than ninety days, there is no evidence in the record to suggest

that any of the waste contained in the Vats of Chemical Waste was placed on the Premises *prior to*

June 1, 2020.

Therefore, based on the credible evidence in the record, the Court makes the reasonable

and logical inference and finding that all the waste contained in the Vats of Chemical Waste (i) was

generated by one or more of the Debtors, (ii) was placed on the Premises during the Term of the

Lease, and (iii) constitutes hazardous waste of the kind that requires proper removal, disposal,

reporting, and tracing under applicable Texas and Federal law and regulations.

## IV.     ANALYSIS

The Landlord contends that it is entitled to an allowed administrative expense claim under

§§ 365(d)(3), 503(b)(1)(A), and 503(b)(3)(D) in the aggregate amount of $1,767,459.03 based on

---

[75] Landlord Ex. 10, pg. 49, lines 1–25 (designated by ECF No. 807 and read into the record).

the following three independent claims:

- $391,368.00 to remove and properly dispose of the Vats of Chemical Waste in compliance with applicable Texas and Federal environmental laws;

- $803,736.00 for the diminution in value to the Premises caused by the existence of hazardous materials on the Premises;

- $537,355.03 in lost rents since August 1, 2023, caused by the Liquidating Debtors' failure to remove the Vats of Chemical Waste from the Premises; and

- $35,000.00 in attorneys' fees and costs related to the above claims of damage.[76]

The Secured Lenders deny that the Landlord is entitled to any of the above categories of alleged administrative expense claims and contend that the Application should be denied in full. The Court will address each independent claim, in turn.

**A.     Landlord's $391,368.00 plus attorneys' fees based on its cost to remove and properly dispose of the Vats of Chemical Waste in compliance with applicable Texas and Federal environmental laws**

The Landlord seeks allowance of an administrative expense claim for the cost and related attorneys' fees incurred to properly remove and dispose of the Vats of Chemical Waste in compliance with Texas and Federal laws and regulations.  The Landlord contends that this claim constitutes an allowable administrative expense claim under §§ 365(d)(3), 503(b)(1)(A), and 503(b)(3)(D).  The Court will address the allowability of this claim under each statutory section, in turn.

---

[76] ECF No. 772, at pg. 9, ¶ 14.  The total attorneys' fees sought by the Landlord is approximately $183,500 comprised of fees to (i) advise the Landlord regarding the proper disposal of the Vats of Chemical Waste in compliance with Texas and Federal environmental law and regulations in the approximate amount of $50,145.00, and (ii) advise the Landlord generally and to prosecute the Application in the approximate amount of $133,355.  *See* Testimony of Ms. Lindauer, 12:00:28 through 12:06:58 and Ms. Mendoza, 12:08:33 through 12:13:25. As detailed herein, the Court allows $50,145.00 in fees incurred by the Landlord to properly dispose of the Vats of Chemical Waste as part of its allowed administrative expense claim, but the Court denies the Landlord's request for attorneys' fees in the approximate amount of $133,355 as part of its administrative expense claim that were incurred to advise the Landlord generally and to prosecute the Application.

Case 22-40487-mxm11   Doc 832   Filed 08/21/23   Entered 08/21/23 14:34:36   Desc
Main Document   Page 22 of 47

### 1. *Landlord's claim based on 11 U.S.C. § 365(d)(3)*

Section 365(d)(3) provides that "[t]he trustee shall timely perform all the obligations of the debtor . . . arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title."[77]   Section 365(d)(3) is not ambiguous and required the Liquidating Debtors to timely perform all obligations that arose under the Lease on or between March 7, 2022[78] (the Petition Date) and July 31, 2022[79] (the Lease rejection date).

### a. *When did the Liquidating Debtors' "obligation" to remove the Vats of Chemical Waste arise under the Lease?*

In support of its claim under § 365(d)(3) relating to the costs, fees, and expenses incurred to remove and properly dispose of the Vats of Chemical Waste, the Landlord cites to Section 21[80] of the Lease, which provides, in pertinent part:

> **21.  Surrender of Premises**.  . . . *At* the expiration or termination of the lease *or Tenant's right to possess the Premises*, Tenant shall (a) deliver to Landlord the Premises broom-clean . . . and free of Hazardous Materials placed on the Premises during the Term.[81]

The Lease provides unambiguously that **_at_** the earlier of the expiration or termination of (i) the Lease, or (ii) the Liquidating Debtors' right to possess the Premises, the Liquidating Debtors had an obligation to "deliver to Landlord the Premises broom clean . . . and free of Hazardous Materials placed on the Premises during the Term."

---

[77] 11 U.S.C. § 365(d)(3).

[78] ECF No. 1 in each of the Liquidating Debtors' bankruptcy cases.

[79] ECF No. 524, at pg. 2.

[80] The Landlord also referenced Sections 8.2 and 25.24 of the Lease in support of its Application.  To the extent the Landlord contends these sections of the lease support its claim under § 365(d)(3), the Court disagrees.  Consequently, the Court need not address the applicability of Sections 8.2 and 25.24 of the Lease when analyzing the Landlord's claim under § 365(d)(3).

[81] Secured Lenders Ex. UU, at pg. 18, ¶ 21.

Undisputedly, the "Term" of the Lease commenced on June 1, 2020. Additionally, the Liquidating Debtors admitted in pleadings[82] and during hearings[83] that their right to possess the Premises would expire or terminate "on or prior to July 31, 2022."[84] Consequently, under the facts in this Case, the Liquidating Debtors right to possess the Premises expired and terminated on July 31, 2022. Therefore, under the terms of the Lease, the Liquidating Debtors' ***obligation*** to deliver the Premises "broom-clean" and "free of Hazardous Materials placed on the Premises during the Term" was triggered on July 31, 2022. The Secured Lenders contend that the above obligation did not trigger until August 1, 2022. The Court disagrees. The obligation in Section 21 of the Lease provides "***at*** the earlier of" not "*after*" the earlier of, as suggested by the Secured Lenders.

The time period for a § 365(d)(3) claim requires an obligation to arise between the Petition Date and the Lease rejection date. Here, the Liquidating Debtors' obligation under the Lease to deliver the Premises "broom-clean" and "free of Hazardous Materials" arose after the Petition Date [June 1, 2020] and prior to or simultaneously with the rejection of the Lease [July 31, 2022]. Therefore, the Landlord satisfied its burden to establish that the Liquidating Debtors' obligation under the Lease to remove the Vats of Chemical Waste from the Premises was triggered within the time period required under § 365(d)(3).

      b. *The costs and fees incurred by the Landlord to remove the Vats of Chemical Waste from the Premises*

As acknowledged by the Liquidating Debtors' counsel during the July 28, 2022, hearing on the Motion to Reject Lease, "we understand that the [L]andlord will agree to pay for the removal

---

[82] ECF No. 518, at pg. 4, ¶ 14.

[83] ECF No. 649, at pg. 6, lines 19–23; ECF No. 510, at pg. 14, lines 19–22.

[84] The Liquidating Debtors' counsel stated on the record the various reasons why the Liquidating Debtors needed to "vacate the premises" on or before July 31, 2022.

of the remaining [Vats of Chemical Waste] and will assert [a] claim against the estate for an administrative claim per the confirmation order."[85]

To establish the amount of its requested administrative expense claim for the removal and proper disposal of the Vats of Chemical Waste, the Landlord offered the testimony of Ms. Carissa Ann Hale ("*Ms. Hale*"), a senior property manager of TIG Real Estate Services, Inc., hired by the Landlord to manage the Premises. Ms. Hale testified credibly about the protocol she undertook, on behalf of the Landlord, to obtain bids from companies authorized to remove the Vats of Chemical Waste in compliance with applicable Texas and Federal laws. The Landlord considered each of the bids obtained by Ms. Hale, and, after consultation with Ms. Hale and Ms. Mary Mendoza (the Landlord's environmental attorney), the Landlord determined that the *Master Services Agreement*[86] bid from Ingenium Group, LLC ("*Ingenium*") was the most informed, thorough, and cost-effective bid to properly remove and dispose of the Vats of Chemical Waste in compliance with Texas and Federal laws.

Ms. Hale's testimony was corroborated by Mr. David Fong ("*Mr. Fong*"), the managing member of Good Life Housing Partners, LLC, which is the managing member of the Landlord. Mr. Fong confirmed that (i) the protocol implemented by Ms. Hale was used to obtain bids for the removal and disposal of the Vats of Chemical Waste, and (ii) the Landlord (a) ultimately selected the bid of Ingenium, and (b) entered into the Master Services Agreement with Ingenium.[87] Mr. Fong further confirmed that Ingenium, pursuant to the Master Services Agreement, sent the Landlord an invoice dated November 15, 2022, in the amount of $391,368.00 (the "*Ingenium*

---

[85] ECF No. 649, at pg. 8, lines 16–23.
[86] Landlord Ex. 15.
[87] Testimony of Mr. Fong, Tr. 2:31:16 through 2:32:43; 3:34:28 through 3:35:52.

Main Document     Page 25 of 47

*Invoice*")[88] and that the Landlord paid the Ingenium Invoice in full.[89]  Mr. Fong testified further

that Ingenium has since requested an additional $200,000 to $300,000 to complete the removal of

the Vats of Chemical Waste,[90] but there is no other evidence in the record to establish that any

such additional amounts were billed by Ingenium or paid by the Landlord.  Finally, the Landlord's

reasonable business judgment to select the Ingenium bid was further corroborated by Mr. Conner

in his designated deposition testimony.[91]

Based upon the credible evidence, the Court finds and concludes that the Landlord has

incurred $391,368.00 in actual costs paid to Ingenium to remove and properly dispose of the Vats

of Chemical Waste.  The Court further finds and concludes that such cost was reasonable.

In addition to the physical removal and disposal costs paid to Ingenium, the Landlord also

incurred legal fees to ensure the Landlord's compliance with applicable Texas and Federal

environmental laws and regulations.  To assist the Landlord with the environmental law and

regulation issues, the Landlord engaged the law firm of Haynes and Boone, LLP, and in particular,

Ms. Mendoza.  Ms. Mendoza testified that she had billed 68.4 total hours to the Landlord through

March 2023 and estimated an additional 15 hours would be billed through April 2023 at an hourly

billing rate of $925 per hour—representing total attorneys' fees of approximately $77,145.00.[92]

Of her total time billed, Ms. Mendoza testified further that approximately 65% ($50,145.00)

related specifically to advising the Landlord concerning (i) Texas and Federal environmental law

and regulation compliance obligations, (ii) TCEQ registrations, and (iii) hazardous material

---

[88] Landlord Ex. 16.

[89] Testimony of Mr. Fong, Tr. 2:32:44 through 2:36:58.

[90] Testimony of Mr. Fong, Tr. 3:32:40 through 3:33:05; 3:35:52 through 3:36:57.

[91] Landlord Ex. 10, pg. 75, lines 1–25 (designated by ECF No. 807 and read into the record).

[92] Testimony of Ms. Mendoza, Tr. 12:08:33 through 12:13:35.

removal and disposal obligations.  The Court found Ms. Mendoza's testimony to be credible and uncontroverted.

Based upon the credible evidence, the Court finds and concludes that the Landlord has incurred $50,145.00 in attorneys' fees specifically related to the proper removal and disposal of the Vats of Chemical Waste in compliance with Texas and Federal laws and regulations.

Therefore, the Court finds and concludes that the Landlord has established, through credible evidence, that it has incurred at least $441,513.00 ($391,368.00 in actual costs and $50,145.00 in attorneys' fees) to remove and properly dispose of the Vats of Chemical Waste.

    *c.   The Secured Lenders first contend that the Landlord's § 365(d)(3) claim fails on procedural grounds*

The Secured Lenders first argue that the Landlord's administrative expense claim based on § 365(d)(3) fails procedurally.  In support of their contention, the Secured Lenders make several contentions that boil down to the following two primary arguments, neither of which the Court finds as persuasive.

    i.   <u>The Secured Lender's argue that the Landlord's claim based on § 365(d)(3) and the Liquidating Debtors' obligations under Section 21 of the Lease should be denied as untimely</u>

First, the Secured Lenders argue that the Landlord failed to specifically reference "§ 365(d)(3)" or "Section 21" of the Lease in the Application.  Consequently, the Secured Lenders contend that any amendment to the Application to include a claim under § 365(d)(3) based on the Liquidating Debtors' obligations under Section 21 of the Lease is not timely under the Scheduling Orders and should be denied.

It is true that the terms "§ 365(d)(3)" or "Section 21" (of the Lease) are not found in the Application.  Some cases hold, however, that the proper way for a landlord to assert a claim caused

by the debtor's breach of § 365(d)(3) is to "assert its administrative claim under § 503(b)."[93] Arguably, under that line of cases, the failure to reference § 365(d)(3) specifically is not fatal.[94]

Notwithstanding the Landlord's failure to specifically reference "§ 365(d)(3)" and "Section 21" of the Lease, the Court disagrees that the Application should be denied as untimely.  As detailed in the *Background Facts*[95] section above, throughout the Liquidating Debtors' Case, the Landlord repeatedly claimed that the Liquidating Debtors had an obligation under the Lease to remove all their property from the Premises at or before vacating the Premises and rejecting the Lease.  In response, the Liquidating Debtors consistently acknowledged such an obligation under the Lease. And, on each such occasion, the Secured Lenders reserved their right to contest the administrative expense claim asserted by the Landlord.

Additionally, the Application provides, in part, that (i) the Liquidating Debtors "failed to remove a large amount of hazardous waste" when they vacated the Premises and rejected the Lease on July 31, 2022;[96] (ii) the Landlord "paid the obligation of the [Liquidating] Debtors to remove . . . the waste that the Debtors improperly" left on the Premises;[97] and (iii) the Landlord (a) "hereby requests approval of payment of its estimated post-petition administrative expenses in the amount of $391,368.00 to be used for hazardous waste and industrial solid waste removal,"[98] and (b) reimbursement of "its reasonable and necessary attorneys' fees and costs."[99] The Court finds that such contentions timely assert a claim under § 365(d)(3).

---

[93] *See In re Imperial Beverage Grp., LLC*, 457 B.R. 490, 499 (Bankr. N.D. Tex. 2011); *see also CIT Commc'ns. Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F. 3d 229, 234–36 (4th Cir. 2005).

[94] The Court will elaborate further on this point, *supra,* in Section II.A.1.e. of this Memorandum Opinion.

[95] *Supra* Section III.

[96] ECF Nos. 531 ¶ 4; 666 ¶ 4; and 772 ¶ 4.

[97] ECF No. 772 ¶ 9.

[98] ECF No. 772 ¶ 14.

[99] *Id.* ¶ 14.

Finally, although the Landlord failed to specifically reference "§ 365(d)(3)" or "Section 21" of the Lease in the Application, the Court finds and concludes that all throughout the Liquidating Debtors' Case, the Landlord repeatedly and timely asserted its right to seek an administrative expense claim based on its contention that the Liquidating Debtors failed to perform their obligation under the Lease between the Petition Date and the date the Liquidating Debtors vacated the Premises, *i.e.* the Lease rejection date —which falls squarely within § 365(d)(3).

Therefore, the Secured Lenders' contention that a claim under § 365(d)(3) based on Section 21 of the Lease was not timely asserted is unpersuasive and ***OVERRULED***.

> ii. <u>The Secured Lender's argue that if the Application intended to seek a claim based on § 365(d)(3) and Section 21 of the Lease, it failed to comply with Bankruptcy Rule 9013; thereby depriving the Secured Lender with fair notice and opportunity to defend against such a claim</u>

Second, the Secured Lenders argue that the Application fails to comply with the pleading requirements of Bankruptcy Rule 9013. The Court disagrees.

Bankruptcy Rule 9013 provides, in pertinent part, that a motion "shall state with particularity the grounds therefor, and shall set forth the relief or order sought."[100] "The purpose of the particularity requirement is to provide notice of the grounds and the prayer of a motion to both the court and the opposing party, providing that party with enough information to process the motion correctly."[101]

The Application specifically contends, in relevant part:

- "Debtors rejected their prepetition unexpired lease and or leases and vacated said Property on or about July 31, 2022."[102]

- "When they did so, they failed to remove a large amount of hazardous waste and industrial solid waste that they abandoned on site, requiring

---

[100] Fed. Rule Bankr. P. 9013.

[101] *In re Aucoin*, 150 B.R. 644, 647 (E.D. La. 1993).

[102] ECF No. 772 ¶ 4.

[Landlord] to undertake its removal in accordance with federal law and Texas Commission on Environmental Quality ("TCEQ") requirements."[103]

- "[Landlord's] post-petition administrative expenses consisting of those waste removal costs currently amount to $391,368.00."[104]

- "[Landlord] further requests its reasonable and necessary attorneys' fees and costs."[105]

The Court finds and concludes that the above contentions alone constitute sufficient notice of a claim under § 365(d)(3) based on Section 21 of the Lease, thereby satisfying the pleading requirements of Bankruptcy Rule 9013. Taken within the context of this Case, it was clear and incontrovertible that the Landlord repeatedly claimed that if the Liquidating Debtors failed to perform their obligation under the Lease to remove all their property at or before the time they vacated the Premises and rejected the Lease, then the Landlord would be entitled to an administrative expense claim. To contend otherwise is not credible and disregards the obvious history in this Case.

Third, the Secured Lenders contend that (i) they "had no idea"[106] the Landlord was asserting a §365(d)(3) claim, and (ii) the Court would be "put[ting] its thumb on the scales" and "making an argument for a party that the party has not made for itself,"[107] if the Court determined that a § 365(d)(3) claim based on Section 21 of the Lease was sufficiently raised by the Landlord in compliance with Rule 9013. The Court rejects both contentions.

---

[103] *Id.*

[104] *Id.*

[105] *Id.* ¶ 14.

[106] Much like Captain Renault was "shocked, shocked to find that gambling is going on here," in the classic movie *Casablanca*, the Secured Lenders here proclaim that they "had no idea" and were shocked, shocked to discover that the Landlord was seeking an administrative expense claim based on facts that fit squarely within § 365(d)(3).

[107] ECF No. 819, at pg. 11.

To contend such shock and surprise is not credible and ignores the Landlord's repeated position throughout the many hearings in this Case—that the Liquidating Debtors were required to perform their obligation under the Lease to remove all their property from the Premises between the Petition Date and the date the Liquidating Debtors vacated the Premises and rejected the Lease.

As detailed in the *Background Facts*[108] section above, the Landlord asserted, on many occasions throughout this Case, that the Liquidating Debtors had an obligation under the Lease to remove all their property at or prior to vacating the Premises—to which the Liquidating Debtors agreed.  Each time the Landlord raised these issues, it consistently stated that it would seek an administrative expense claim should the Liquidating Debtors fail to remove all their property.  In response, the Secured Lenders consistently reserved their right to contest the Landlord's administrative expense claim.  Additionally, in each of those hearings, the Court made clear to each of the parties—the Landlord, the Liquidating Debtors, and the Secured Lenders—that each party was reserving its rights concerning such claims.

Finally, on March 21, 2023—approximately one month prior to the hearing on the Application, the Landlord and the Secured Lenders participated in a hearing on the Landlord's Motion to Vacate Abandonment Order.[109]  At the conclusion of that hearing, the Court took the Motion to Vacate Abandonment Order under advisement and informed the parties that the Court would issue a ruling on the motion at or after the time the Court issued a ruling on the Application.[110]  Additionally, and relevant here, the Court and counsel for the Landlord and Secured Lenders engaged in an extensive discussion relevant to both the Motion to Vacate

---

[108] *Supra* Section III.

[109] *GL Eden, LLC's Motion to Vacate or Modify Order Granting Abandonment Motion Pursuant to Fed. R. Civ. P. 60(b)*, ECF No. 500 (the "***Motion to Vacate Abandonment Order***").

[110] *See Order Denying Motion to Vacate Abandonment Order* can be found at ECF No. 831.

Abandonment Order ***and*** the upcoming hearing on the Application.    The Court made several

comments and observations regarding the upcoming hearing on the Application, including:

- "[W]e had the sale hearing, the confirmation hearing, the abandonment hearing. We had a lot of hearings on very expedited notice. And we had a lot of conversation amongst the parties, including [Initial Landlord's counsel] when she was representing the [Initial Landlord], and then subsequent, [Landlord's current counsel]. And I think I made it very clear from day one, I want all the parties to reserve their rights."[111]

- "That was the whole argument that [Initial Landlord's counsel] made in several hearings that, you know, post-petition date and pre-rejection date, we want to make sure, using her words, not mine, "that the property is clean.""[112]

- "But during the entirety of the case, post-petition, pre-rejection, it's clear that the landlord, through [counsel], was saying the counterparty to the lease has an obligation. ***And when you look at 365(d)(3), that's one of the obligations that the landlord must -- that the tenant must comply with***."[113]

- "I understand the arguments that you've made, Mr. Lapowsky [Secured Lenders' counsel], but I'm reserving the rights for the parties to make all their arguments and let the chips fall where they may."[114]

After the Court concluded its comments, the Secured Lenders' counsel responded, "[w]ell

your Honor, I certainly understand that I'm not going to change your mind and I'm not going to

try to change your mind on how you're going to dispose of this today."[115]

Following the Court's comments on March 21, 2023, the Secured Lenders did not raise an

issue or concern about the Court's comments in general or the Court's specific reference to §

365(d)(3).   Further, at no time between March 21, 2023, and April 17, 2023, did the Secured

Lenders (i) seek to clarify the Court's comments and reference to § 365(d)(3); (ii) request to extend

---

[111] ECF No. 810, pg. 125, lines 13–21.

[112] ECF No. 810, pg. 126, lines 5–8.

[113] ECF No. 810, pg. 128, lines 19–24.

[114] ECF No. 810, pg. 128, line 25 through pg. 129, line 3.

[115] ECF No. 810, pg. 130, lines 13–16.

the discovery deadline to take further discovery, if needed, to allow the Secured Lenders to be prepared to defend against a claim under § 365(d)(3); or (iii) seek to continue the April 17, 2023, hearing.

The Secured Lenders claim of shock and surprise is not credible. It was abundantly clear throughout the pendency of this Case that the Landlord would seek an administrative expense claim that could potentially fall within the Liquidating Debtors' obligations under § 365(d)(3). Additionally, the Court specifically referenced § 365(d)(3) during the March 21, 2023, hearing—a month prior to the hearing on the Application.

Therefore, the Secured Lenders' contentions that (i) the Application fails to comply with Bankruptcy Rule 9013 and (ii) the Secured Lenders were deprived of fair notice and opportunity to defend against a claim under § 365(d)(3) are both unpersuasive and ***OVERRULED***.

> d. *The Secured Lenders next contend that the Landlord's § 365(d)(3) claim fails on the merits*

The Secured Lenders next contend that, even if the Landlord's administrative expense claim under §365(d)(3) is not procedurally flawed, the Application still fails on the merits. In support of their objection, the Secured Lenders make several contentions that, again, boil down to the following two relevant[116] arguments, neither of which the Court finds as persuasive.

> i. The Secured Lenders contend that the Landlord failed to satisfy its burden to establish that the Vats of Chemical Waste were placed on the Premises after the commencement of the Term of the Lease—June 1, 2020

First, the Secured Lenders argue that it is *possible* that the waste contained in the Vats of Chemical Waste was first placed on the Premises prior to June 1, 2020—the commencement of

---

[116] The Secured Lenders contend that Sections 8.2 and 24.25 of the Lease do not support a claim under § 365(d)(3). The Court agrees. Therefore, the Court need not address the Secured Lenders arguments addressing these sections of the Lease as they relate to § 365(d)(3). *See* ECF No. 819, pgs. 12–16.

the Term of the Lease—which would be outside the Lease Term under Section 21 of the Lease.  In support of this contention, the Secured Lenders suggest that "Fore Machine was operating from the leased premises prior to June 1, 2020"; therefore, it "is entirely possible" that waste generated by Fore Machine prior to June 1, 2020, is included in the Vats of Chemical Waste. [117]  The Secured Lenders' suggestion that such waste *could* have been placed on the Premises prior to the Term and remained on the Premises *for over two years* is not credible and not supported by the evidence. There is no evidence in the record to suggest that any of the waste contained in the Vats of Chemical Waste was generated and placed on the Premises *prior to* the Term of the Lease.  Rather, the credible evidence in the record suggests that all such waste generated by any of the Debtors should not be stored on the Premises for more than 90 days.[118]  As such, the waste generated by any of the Debtors should have been cycling to and from the Premises approximately every 90 days.

Based on the credible evidence in the record, the Court finds that the waste included in the Vats of Chemical Waste was generated by one of the Liquidating Debtors and placed on the Premises during the Term of the Lease.  Therefore, the Secured Lenders' contention that the Landlord failed to satisfy its burden is unpersuasive and ***OVERRULED***.

ii. The Secured Lenders contend that the obligation of the Liquidating Debtors to remove the Vats of Chemical Waste did not arise until *after* the Lease was rejected—on August 1, 2022

First, the Secured Lenders argue that the Liquidating Debtors' obligation in Section 21 of the Lease was not triggered *prior to* the rejection of the Lease and was, therefore, outside the required time period under § 365(d)(3).  For the reasons previously addressed in this Memorandum

---

[117] ECF No. 819, at pg. 17.

[118] *See* Landlord Ex. 10, pg. 48, line 17 through pg. 49, line 25 (read into the record) (testimony of Mr. Connor regarding EPA requirements). *See Supra* Section III.E.2. of this Memorandum Opinion.

Opinion, the Court disagrees and specifically finds and concludes that the Liquidating Debtors' obligation was triggered on July 31, 2022, within the time period required under § 365(d)(3).

Consequently, the Landlord satisfied its burden to establish that the Liquidating Debtors' obligation under Section 21 of the Lease arose within the time period required under § 365.[119] Therefore, the Secured Lenders' contention that the Liquidating Debtors' obligation in Section 21 of the Lease to remove the Vats of Chemical Waste was not triggered until after the Lease was rejected, outside the required time period under § 365(d)(3), is unpersuasive and **OVERRULED.**

### e.   The Landlord's remedy for its § 365(d)(3) claim

The Court has found and concluded that the Liquidating Debtors failed to timely perform their obligation under the Lease to remove the Vats of Chemical Waste from the Premises in violation of § 365(d)(3).  The question then becomes, what remedy does a landlord have when a debtor ignores or breaches its obligation under § 365(d)(3)?  Three lines of cases have developed around this question, each offering a potentially different answer.

The "majority view" holds that § 365(d)(3) gives the landlord an automatic administrative expense claim for the post-petition lease obligations that arise while the debtor decides to assume or reject the lease.[120]  "According to these courts, the landlord's right to an administrative expense claim is triggered by § 365(d)(3) alone, and the landlord need not show the estate received a benefit under § 503(b)(1)."[121]  Under the "majority view," based on the Court's findings and conclusions

---

[119] The Landlord also contends that obligations of the Liquidating Debtors under Sections 8.2 and 25.24 of the Lease were triggered within the time period required under § 365(d)(3) to support an administrative expense claim.  The Court disagrees such obligations were triggered within the time period required under § 365(d)(3); therefore, the Landlord's claims under § 365(d)(3) based on Sections 8.2 and 25.24 of the Lease are DENIED.  The Court need not detail why the Landlord's § 365(d)(3) claims based on Sections 8 and 25.24 of the Lease are denied, because the Court has found and concluded that an obligation of the Liquidating Debtors was triggered under Section 21 of the Lease to support a § 365(d)(3) administrative expense claim.

[120] *See In re Imperial Beverage Grp., LLC*, 547 B.R. at 498 (citing 3 *Collier on Bankruptcy* ¶ 365.04[1] (Alan N. Resnick & Harry J. Sommer eds., 16th ed. 2011) (discussing majority view and collecting cases).

[121] *See In re Imperial Beverage Grp., LLC*, 457 B.R. at 498.

above, the Landlord is entitled to an allowed administrative expense claim in the amount of $441,513.00.

In contrast, a "minority view" of courts hold that the landlord must still satisfy all the elements in § 503(b)(1), including the requirement to establish a benefit to the estate.[122] The Court finds the "minority view" is unpersuasive. Because the Court finds the "minority view" unpersuasive, however, the Court need not determine if the Landlord has satisfied all the requirements of § 503(b)(1)(A) for its claim based on the Liquidating Debtors' breach of § 365(d)(3). But, even under the "minority view," it is possible that the Landlord may still be entitled to an allowed administrative expense claim.

A third line of cases developed because they found problems with both the majority and minority views. These cases suggest a "mid-way" point of view.[123] As previously noted in Section II.A.1.c.i. of this Memorandum Opinion, this third line of cases suggest that "a [landlord] must still assert its administrative expense claim under § 503(b); but it is not required to assert and establish each element under a specific provision in § 503(b)(1)(A)."[124]

The Court need not determine whether the "majority view" or "mid-way" view is the better reasoned view because the Court finds and concludes that the Landlord has satisfied its burden under both views. The Landlord established that the Liquidating Debtors breached their obligation under Section 21 of the Lease within the time period required in § 365(d)(3). By proving and prevailing on the § 365(d)(3) argument and asserting an administrative expense claim, the Landlord is entitled to an administrative expense claim under § 503(b).

---

[122] *See In re Imperial Beverage, Grp., LLC*, 457 B.R. at 498. This view appears to this Court to be contrary to the clear language in § 365(d)(3).

[123] *See CIT Commc'ns Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F. 3d at 235–36.

[124] *See In re Imperial Beverage, Grp., LLC*, 457 B.R. at 499.

Based on the foregoing, the Court finds and concludes that the Landlord's Application requesting an allowed administrative expense claim under § 503(b) based on the Liquidating Debtors' breach of § 365(d)(3) is hereby ***GRANTED*** in the allowed amount of ***$441,513.00***; and the Secured Lenders' Objection on this ground is hereby ***OVERRULED***.

### 2. *Landlord's claim based on 11 U.S.C. § 503(b)(1)(A)*

Even if the Landlord were not entitled to an allowed administrative expense claim based on the Liquidating Debtors' breach of § 365(d)(3), for the reasons set forth below, the Court finds and concludes that the Landlord's request for an allowed administrative expense claim for the cost to properly dispose of the Vats of Chemical Waste is also allowed under § 503(b)(1)(A).

Section 503(b)(1)(A) provides, in relevant part, that "there shall be allowed administrative expenses . . . including (1)(A) the actual, necessary costs and expenses of preserving the estate."[125] The Fifth Circuit has held that "[i]n order to qualify as an 'actual and necessary cost' under section 503(b)(1)(A), a claim against the estate must have arisen post-petition and as a result of actions taken by the [claimant] that benefitted the estate."[126] "Courts have construed the words 'actual' and 'necessary' narrowly: the debt must benefit [the debtor's] estate and its creditors."[127] Consequently, the relevant inquiry for this Court is; did the Landlord's claim in the amount of $441,513.00 for the proper removal and disposal of the Vats of Chemical Waste arise post-petition and benefit the Liquidating Debtors' estates?[128]

---

[125] 11 U.S.C. § 503(b)(1)(A); *see also Tex. v. Lowe (In re H.L.S. Energy Co. Inc.)*, 151 F.3d 434, 437 (5th Cir. 1998).
[126] *Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385, 387 (5th Cir. 2001); *In re Northstar Offshore Grp., LLC*, 628 B.R. 286, 299 (Bankr. S.D. Tex. 2020).
[127] *NL Indus., Inc. v. GHR Energy Corp.*, 940 F.2d 957, 966 (5th Cir. 1991); *Tex. v. Lowe (In re H.L.S. Energy Co., Inc.)*, 151 F.3d at 437. "Generally, section 503(b) priorities should be narrowly construed to maximize the value of the estate for all creditors." 4 COLLIER ON BANKRUPTCY ¶ 503.06[2].
[128] *In re Enron Corp.*, 279 B.R. 79, 85 (Bankr. S.D.N.Y. 2002).

36

As previously addressed in this Memorandum Opinion, the Court finds and concludes that all the waste contained in the Vats of Chemical Waste (i) was generated and placed on the Premises by the Liquidating Debtors; (ii) constitutes hazardous waste of the kind that requires proper removal, disposal, reporting, and tracing under applicable Texas and Federal laws and regulations; (iii) was not subject to the Abandonment Motion; and (iv) remained property of the Liquidating Debtors' bankruptcy estates notwithstanding the Abandonment Order and Order Rejecting Lease. Consequently, the legal ownership and financial responsibility for the proper removal and disposal of the waste contained in the Vats of Chemical Waste remained with the Liquidating Debtors and their bankruptcy estates until the Liquidating Plan went effective. Thereafter, it appears the legal ownership and financial responsibility for the Vats of Chemical Waste became the responsibility of the Plan Administrator.[129]

Because of the uncertainty and dispute concerning the effect, if any, the Abandonment Order may have had on the Vats of Chemical Waste, both parties referenced and argued the applicability of the United States Supreme Court's *Midlantic*[130] decision. In *Midlantic*, the Supreme Court established that a trustee or debtor-in-possession may not abandon property in contravention of a statute or regulation that is designed to protect public health and/or safety. While concluding that abandonment of contaminated property under Section 554 of the Bankruptcy Code is not, in most cases, a viable option for a debtor, the Supreme Court did not reach the question of whether a party can seek reimbursement of remediation costs as an

---

[129] The Liquidating Plan went effective on October 4, 2022. Under the Liquidating Plan, on the Effective Date, the Plan Administrator was assigned the authority to (i) "direct and control the wind down, liquidation, sale and/or abandoning of the remaining asserts of the Liquidating Debtors," and (ii) "determine whether to create a liquidating trust for the assets of a Liquidating Debtor and which assets to transfer to such liquidating trust." *See* Liquidating Plan at pg. 22, ¶ IV.D.(iii) and pg. 23, ¶ IV.D.(xii). The term "assets" is not defined in the Liquidating Plan or Confirmation Order. The Court found no other provisions in the Liquidating Plan or Confirmation Order that addressed what happens to property of the estate that existed on the Effective Date.

[130] *Midlantic Nat'l Bank v. N.J. Dep't of Env't Prot.*, 474 U.S. 494 (1986).

administrative expense.[131]   Since the Court finds and concludes that the Abandonment Order did

not apply to or cause the Liquidating Debtors' estates to abandon the Vats of Chemical Waste, the

*Midlantic* case is not relevant in this dispute.

Similarly, both parties argued the applicability of the United States Supreme Court's

*Reading*[132] decision.   In *Reading*, the Supreme Court granted an administrative expense claim to a

tort claimant after the trustee—while administering the estate—caused a fire to the tort claimant's

building.[133]   Here, there is no evidence that the Liquidating Debtors committed any wrongful acts

or torts; therefore, the *Reading* case is not relevant in this dispute.[134]

After the *Midlantic* decision, lower federal courts have dealt with a variety of issues

concerning the treatment of remediation costs during a bankruptcy case.   In *Chateaugay*,[135] the

Second Circuit addressed whether post-petition cleanup remediation costs related to pre-petition

conduct are entitled to administrative priority.   The *Chateaugay* court reasoned that "expenses to

remove the threat posed by such substances are necessary to preserve the estate."[136]   While its

ruling allowed an environmental post-petition clean-up cost as an administrative expense, the

Second Circuit also recognized that these types of costs each require a particularized

determination.[137]   Thus, this Court must consider the important distinctions, if any, between the

facts in *Chateaugay* and the facts in this Case.

---

[131] *Id*. at 498 n.2 ("The sole issue presented by these petitions is whether a trustee may abandon property under § 554 in contravention of local laws designed to protect the public's health and safety.  New York is claiming reimbursement for its expenditures as an administrative expense.  That question, however, like the question of the ultimate disposition of the property, is not before us.").

[132] *Reading Co. v. Brown*, 391 U.S. 471, 477 (1968).

[133] *Id*. at 485.

[134] *See Jack/Wade Drilling, Inc.*, at 258 F.3d at 391 ("We recognize that we have strictly construed the *Reading* exception).

[135] *In re Chateaugay Corp.*, 944 F.2d 997, 1009 (2d Cir. 1991).

[136] *Id*. at 1010.

[137] *Id*.

First, in *Chateaugay,* the debtor continued to own and operate the contaminated properties;[138] here, the Liquidating Debtors' estates, and then their successors under the confirmed Liquidating Plan, also continued to own the Vats of Chemical Waste.

Second, in *Chateaugay,* the Environmental Protection Agency (the "***EPA***")—a federal government agency—stepped in to undertake remediation efforts when the debtor failed to do so;[139] here, the TCEQ—a Texas governmental agency—also was active in the Case and argued:

> It is TCEQ's priority that these chemicals properly be disposed of whether it be paid for by the debtor or paid for by the landlord.  They just need to be properly disposed of so that we don't have issues contaminating the environment or compromising health and human safety.[140]

> and

> [T]hrough conversations had with the [Liquidating] Debtors and Landlord counsel, we knew that there would be a party responsible for handling this hazardous waste . . . TCEQ needs to make sure that there's somebody other than the State of Texas that will dispose of this hazardous waste properly.[141]

Third, in *Chateaugay,* the EPA's claim was hardly speculative since the EPA was undertaking the remediation work;[142] here, the Landlord's claim also is liquidated and not speculative.

For each of these three important considerations, the Court finds and concludes that the facts in *Chateaugay* are similar to the present Case, and *Chateaugay* is a persuasive authority to support the Landlord's request for an allowed administrative expense in this Case.

---

[138] *Id.* at 999.

[139] *Id.*

[140] ECF No. 649, at pg. 10, lines 14–18.

[141] ECF No. 810, at pg. 13, lines 8–14.

[142] *Id.* at 999–1000.

The Secured Lenders contend that this Court's prior ruling in *Rockall*[143] requires the Court

to deny the Landlord's § 503(b)(1)(A) claim.  The Court disagrees.  The facts in *Rockall* are clearly

distinguishable from the facts in this Case.  For example, where each of the facts in this Case line

up with the facts in *Chateaugay*, as noted above, the facts in *Rockall* do not line up with any of the

*Chateaugay* facts discussed above.  The distinguishable facts include: (i) the *Rockall* Debtors "sold

their interests in the Well Site" with an express assumption of post-closing environmental

liabilities falling to the purchaser, rather than continuing to own and operate the contaminated

properties;[144] (ii) the *Rockall* record contained no reference to involvement of a state or federal

governmental regulatory agency;[145] and (iii) the alleged costs and expenses requested in *Rockall*

were denied because the individual requesting administrative expenses (Ms. Baucum) did "not

demonstrate[] that she has expended any money for remediation or response clean-up costs or that

she [would] be required to do so in the future."[146]

Next, the District Court for the Northern District of Texas previously held:

> In the context of environmental claims, the meaning of "preserving the
> estate" under Section 503 of the Code has been expanded to encompass
> protection of the environment and public health. The Supreme Court in
> *Midlantic National Bank v. New Jersey Department of Environmental
> Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), enunciated
> the obligations of a bankruptcy trustee or a debtor-in-possession in ensuring
> that the environment and public health are not unduly degraded: [A]nyone
> in possession of the site . . . must comply with the environmental laws. . . .
> Plainly, that person or firm may not maintain a nuisance, pollute the waters
> of the State, or refuse to remove the source of such conditions. … The
> Supreme Court in *Midlantic* further restricted the ability of a trustee or debtor
> to abandon property where such abandonment would result in "imminent and
> identifiable harm" to the public health or safety.[147]

---

[143] *See In re Rockall Energy Holdings, LLC, et al.*, Bankr. N.D. Tex. 22-90000 (*Order Disallowing Administrative Expense*, ECF No. 905).

[144] *Id.* at 12.

[145] *Id.* at 13.

[146] *Id.*

[147] *In re Nat'l Gypsum Co.*, 139 B.R. 397, 413 (N.D. Tex. 1992).

Finally, the Fifth Circuit has made clear that the proper handling, removal, and disposal of hazardous materials constitutes an ongoing obligation of a debtor in possession.  If the debtor in possession fails to meet its obligation to properly remove and dispose of hazardous materials, then the party that performs and pays for the proper removal and disposal of the hazardous materials, *on behalf of the Debtors' estate*, is entitled to an administrative expense claim for the costs incurred.[148]

Based on the foregoing case law, authorities, and facts of this Case, the Court finds and concludes that (i) the Liquidating Debtors' obligation to properly dispose of the Vats of Chemical Waste continued post-petition, and (ii) by paying for the proper removal and disposal of the Vats of Chemical Waste, on behalf of the Liquidating Debtors, the Landlord benefitted the Liquidating Debtors' estates.  Consequently, the Landlord satisfied its burden to establish an administrative expense claim under § 503(b)(1)(A) in the amount of $441,513.00.  Therefore, the Landlord's Application requesting an allowed administrative expense claim under § 503(b)(1)(A) for the proper removal and disposal of the Vats of Chemical Waste is hereby ***GRANTED*** in the allowed amount of ***$441,513.00***;[149] and the Secured Lenders' Objection on this ground is hereby ***OVERRULED***.

### 3.  *Landlord's claim based on 11 U.S.C. § 503(b)(3)(D)*

The Court also finds and concludes that the Landlord's claim for the proper removal and disposal of the Vats of Chemical Waste satisfies § 503(b)(3)(D) of the Bankruptcy Code.

---

[148] *Matter of H.L.S Energy Co., Inc.*, 151 F.3d 434, 438–39 (5th Cir. 1998) ("[T]he trustee here was obligated to plug the wells. . . . [T]he instant trustee's failure to plug the wells resulted in the state's action in plugging them, an action for which the bankrupt estate was obligated to pay. This, too, must be given priority.").
[149] The Landlord is entitled to only one recovery for the removal of the Vats of Chemical Waste from the Premises in the total amount of $441,513.00, which is supported by both §§ 365(d)(3) and 503(b)(1).

Section 503(b)(3)(D) provides, in relevant part, that "the actual, necessary expenses . . . incurred by—. . . (D) a creditor . . . in making a substantial contribution in a case under chapter 9 or 11 of this title."[150]  The Fifth Circuit established the elements of a § 503(b)(3)(D) "substantial contribution" claim in *DP Partners,*[151] stating:

> [S]ection 503 patently states that a creditor is entitled to actual and necessary expenses "incurred … in making a substantial contribution in a case under chapter 9 or 11." Finding no statutory definition and nothing in the entire statutory scheme or legislative history to indicate a contrary intent, we abide by the canon that words in a statute are to be given their "ordinary, everyday" meaning. Thus, the phrase "substantial contribution" in section 503 means a contribution that is "considerable in amount, value or worth."
>
> . . .
>
> The development of a more concrete standard of substantial contribution is best left on a case-by-case basis. At a minimum, however, the court should weigh the cost of the claimed fees and expenses against the benefits conferred upon the estate which flow directly from those actions. Benefits flowing to only a portion of the estate or to limited classes of creditors are necessarily diminished in weight. Finally, to aid the district and appellate courts in the review process, bankruptcy judges should make specific and detailed findings on the substantial contribution issue.[152]

The Secured Lenders contend that the Landlord's § 503(b)(3)(D) claim should be denied as time barred.[153]  The Court disagrees.  Similar to the Landlord's claims under § 365(d)(3), the Landlord repeatedly and timely asserted its right to seek an administrative expense claim for its having to remove and dispose of the Vats of Chemical Waste due to the Liquidating Debtors' failure to properly remove and dispose of the Vats of Chemical Waste—which falls squarely within § 503(b)(3)(D).  Additionally, the Landlord specifically included this claim in its *First Amended*

---

[150] 11 U.S.C. § 503(b)(3)(D).

[151] *In re DP Partners Ltd. P'ship*, 106 F.3d 667 (5th Cir. 1997).

[152] *Id.* at 673.

[153] ECF No. 686, at pgs. 8–9, ¶¶ 25–30.

*Application to Approve Payment of Administrative Expense Claim*,[154] which was filed prior to the

January 6, 2023, deadline under the Scheduling Orders.

The Secured Lenders also contend that the Landlord's § 503(b)(3)(D) claim should be

denied on the merits.  Again, the Court disagrees.  The Landlord contends that it made "a

substantial contribution" under § 503(b)(3)(D) by coordinating and paying for the proper removal

and disposal of the Vats of Chemical Waste on behalf of the Liquidating Debtors.  The Court

agrees.  As detailed above, the legal ownership and financial responsibility for the proper removal

and disposal of the waste contained in the Vats of Chemical Waste remained with the Liquidating

Debtors and their bankruptcy estates until the Liquidating Plan went effective.  Thereafter, it

appears the legal ownership and financial responsibility for the Vats of Chemical Waste became

the responsibility of the Plan Administrator.

At the hearing on the Motion to Reject Lease, counsel for the Liquidating Debtors stated

"we understand that the landlord *will agree to pay* for the removal of the remaining chemicals and

will assert claim against the estate for an administrative claim per the confirmation order."[155]  The

Liquidating Debtors' statement acknowledged the benefit realized by their estates when the

Landlord agreed to "pay for the removal of the remaining chemicals"—a legal and financial

obligation of the Liquidating Debtors' estates.  And, in return, the Landlord agreed to seek

reimbursement in the form of an administrative claim.  The only condition, of course, was that the

Landlord would have to prove up the amount of its claim, not the entitlement to its claim.

Additionally, the Landlord knew that the only assets available to pay an allowed administrative

expense claim is the $500,000 Reserve.

---

[154] ECF No. 666.

[155] ECF No. 649, at pg. 8, lines 16–23 (emphasis added).

Based on the facts and circumstances in this Case, the Court finds and concludes that the Landlord made a substantial contribution to the Liquidating Debtors' estates by properly removing and disposing of the Vats of Chemical Waste in compliance with Texas and Federal laws and regulations.  Therefore, the Landlord's Application requesting an allowed administrative expense claim under § 503(b)(3)(D) as reimbursement for the cost to properly remove and dispose of the Vats of Chemical Waste is hereby ***GRANTED*** in the allowed amount of ***$441,513.00***;[156] and the Secured Lenders' Objection on this ground is hereby ***OVERRULED***.

**B.      Landlord's $803,736.00 claim for the alleged diminution in value to the Premises**

The Landlord seeks allowance of an administrative expense claim in the amount of $803,736.00 for the alleged diminution in value to the Premises caused by the existence of hazardous materials on the Premises.[157]  The Secured Lenders objects to this claim as untimely and on the merits.  The Court agrees with the Secured Lenders' objections on both grounds.

First, the Landlord's claim for the alleged diminution in value of the Premises is untimely. Unlike the Landlord's claim based on the Liquidating Debtors' breach of § 365(d)(3) and substantial contribution under § 503(b)(3)(D)—which the Landlord raised early and often throughout this Case as detailed above—the Landlord did not raise this claim until February 24, 2022, after the January 6, 2022, deadline to assert such a claim under the Scheduling Orders. Although the Court extended the deadline to file an amended application to February 24, 2022, such amendments were contingent upon newly discovered facts.  The Court finds and concludes that the addition of the diminution in value claim was not based on newly discovered facts;

---

[156] The Landlord is entitled to only one recovery for the removal of the Vats of Chemical Waste from the Premises in the total amount of $441,513.00, which is supported by both §§ 365(d)(3) and 503(b)(1).

[157] ECF No. 772 ¶¶ 12 and 14.

therefore, the Landlord's claim for the alleged diminution in value of the Premises is denied as untimely.

Second, even if the Landlord had timely raised a claim based on the alleged diminution in value of the Premises, the Court finds and concludes that the evidence offered by the Landlord in support of this claim was not credible or persuasive.  Therefore, the Court finds and concludes that the Landlord's claim based on the alleged diminution in value of the Premises is denied on the merits.

Finally, even if the Landlord had timely raised and established, with credible evidence, a claim based on the alleged diminution in value of the Premises, the Court finds and concludes that as a matter of law, the claim constitutes a pre-petition unsecured damage claim under § 502(b)(6), as opposed to an administrative expense claim.  Therefore, the Court finds and concludes that the Landlord's claim based on the alleged diminution in value of the Premises is denied as a matter of law.

Based on the foregoing, the Court finds and concludes that the Landlord's Application requesting an allowed administrative expense claim of $803,736.00 for the alleged diminution in value to the Premises caused by the existence of hazardous materials on the Premises is hereby **DENIED** in full; and the Secured Lenders Objection regarding such administrative expense claim is hereby **SUSTAINED**.

## C.    Landlord's $537,355.03 claim for lost rents since August 1, 2023

The Landlord seeks allowance of an administrative expense claim in the amount of $537,355.03 for the alleged lost rents caused by the Liquidating Debtors' failure to properly remove and dispose of the Vats of Chemical Wastes from the Premises.[158]  The Secured Lenders

---

[158] ECF No. 772 ¶¶ 11 and 14.

object to this claim as untimely and on the merits.  The Court agrees with the Secured Lenders on both grounds.

First, the Landlord's claim for alleged lost rents is untimely.  Again, unlike the Landlord's claim based on the Liquidating Debtors' breach of § 365(d)(3) and substantial contribution under § 503(b)(3)(D)—which the Landlord raised early and often as detailed above—the Landlord did not raise this claim until February 24, 2022, after the January 6, 2022, deadline to assert such a claim under the Scheduling Orders.  Although the Court extended the deadline to file an amended application to February 24, 2022, such amendments were contingent upon newly discovered facts. The Court finds that the addition of the lost rents claim was not based on newly discovered facts; therefore, the Court finds and concludes that the Landlord's claim based on lost rents should be denied as untimely.

Second, even if the Landlord had timely raised a claim based on lost rents, the Court finds and concludes that the evidence offered by the Landlord in support of this claim was not credible or persuasive.   Therefore, the Court finds and concludes that the Landlord's claim based on lost rents caused by the Liquidating Debtors' failure to properly remove and dispose of the Vats of Chemical Wastes from the Premises should be denied on the merits.

Finally, even if the Landlord had timely raised and established with credible evidence a claim based on the alleged lost rents, the Court finds and concludes that as a matter of law, such claim constitutes a pre-petition unsecured damage claim under § 502(b)(6), as opposed to an administrative expense claim.  Therefore, the Court finds and concludes that the Landlord's claim based on the lost rents should be denied as a matter of law.

Based on the foregoing, the Court finds and concludes that the Landlord's Application requesting an allowance of an administrative expense claim in the amount of $537,355.03 for the

Case 22-40487-mxm11    Doc 832    Filed 08/21/23    Entered 08/21/23 14:34:36    Desc
Main Document    Page 47 of 47

alleged lost rents caused by the Liquidating Debtors' failure to properly remove and dispose of the Vats of Chemical Wastes from the Premises is hereby ***DENIED*** in full; and the Secured Lenders Objection regarding such administrative expense claim is hereby ***SUSTAINED***.

## V.    CONCLUSION

For all the reasons detailed above, the Court **ORDERS** as follows:

1.  The Landlord's Application seeking allowance of an administrative expense claim under §§ 365(d)(3), 503(b)(1)(A), and/or 503(b)(3)(D) is hereby ***GRANTED*** in the total allowed amount of ***$441,513.00***.

2.  The Plan Administrator shall pay to the Landlord its administrative expense claim in the allowed amount of ***$441,513.00*** from the $500,000 Reserve[159] within fourteen (14) calendar days from the entry of this Order.

3.  All other relief requested in the Application is ***DENIED***.

### ### END OF MEMORANDUM OPINION ###

---

[159] *See* Confirmation Order, ECF Nos. 398 and 400, at pgs. 39–40, ¶ 33.